**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No.: 07-cv-6431 |
| JOSE SUAREZ, | ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff United States of America brings this action to revoke Defendant Jose Suarez's citizenship and cancel his certificate of naturalization. Currently pending before the Court is Plaintiff's motion for summary judgment [40]. For the following reasons, the Court grants Plaintiff's motion [40].

**I.      Background**

   **A.      Procedural History**

This is a civil action brought by the United States under section 340(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1451(a), to revoke its grant of citizenship to Defendant Jose Suarez, who was admitted to United States citizenship on May 14, 1998. After completing discovery, Plaintiff filed a motion for summary judgment, at which time defense counsel moved to withdraw as attorney for Suarez. The Court entered and continued the motion for summary judgment to give Defendant Suarez time to secure new counsel. When he was unable to secure counsel on his own, the Court granted Defendant *in forma pauperis* status and appointed an attorney to represent him.

The complaint alleges that Suarez was statutorily ineligible to be naturalized as a citizen and that his naturalization can be revoked on any of three grounds: (1) it was illegally procured because he could not satisfy the good moral character requirement for naturalization (Count I); (2) it was illegally procured because he gave false testimony during his naturalization interview pursuant to 8 U.S.C. §§ 1451(a), 1427(a)(3), and 1101 (f)(6) (Count II); and (3) it was procured by concealment of a material fact or by willful misrepresentation (Count III). Plaintiff has moved for summary judgment only as to Count I.

**B.     Factual History**

Defendant Jose Suarez, a male native of Mexico, has been living in the United States since 1978. On July 17, 1978, he became a lawful permanent resident. In December 1996, Suarez filed an application for naturalization with the former Immigration and Naturalization Service ("INS").[1] At the time of his application, Suarez had no prior criminal convictions. The INS interviewed Suarez about his criminal history, and Suarez provided the requested information concerning prior criminal charges that had been dropped. On April 4, 1998, the INS approved Suarez's application, and he was naturalized on May 14, 1998.

Approximately three and a half months after his naturalization, Suarez was arrested and indicted for Conspiracy to Possess with Intent to Distribute Marijuana in violation of 21 U.S.C. § 846 and Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1). Count I of the indictment charged that between June 1996 and October 22, 1996, Suarez conspired with three other individuals to knowingly and intentionally possess marijuana. Count II of the Indictment charged that during the same time period (June 1996 through October 1996),

---

[1] On March 1, 2003, INS was moved from the U.S. Department of Justice to the U.S. Department of Homeland Security ("DHS"). This opinion will refer to the DHS as the INS when making reference to events occurring prior to the changeover.

Suarez knowingly and intentionally possessed with the intent to distribute approximately 196 pounds (or 89 kilograms) of marijuana.

Suarez pled not-guilty and contested the charges, but on February 10, 1999, he was convicted on both counts. On July 13, 1999, Suarez was sentenced to eighty-seven months in prison followed by two concurrent terms of supervised release (for four and three years) and a restitution fine of $750.[2] Suarez filed a timely appeal of his conviction in which he challenged the district court's finding that he supervised others in the conspiracy and that the quantity of marijuana involved was at least 100 kilograms. On February 8, 2000, the Seventh Circuit affirmed the judgment of the district court. Suarez served his prison term, including participation in a drug/alcohol rehabilitation program, and the full term of probation, and he paid his restitution fine in full.

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

---

[2] Judge Castillo upwardly adjusted Suarez's prison sentence to eighty seven (87) months because he determined that Suarez's role in the criminal enterprise involved the recruitment of others and supervision of their activities. Suarez's prison sentence also was increased because Judge Castillo determined that the amount of marijuana involved in Suarez's offenses exceeded the 89 kilograms that his co-conspirators possessed when they were arrested on October 22, 1996. Since Suarez also participated in the movement of two earlier shipments of marijuana that occurred on separate occasions, Judge Castillo surmised that the total amount of marijuana involved was at least 100 kilograms. Accordingly, the sentence imposed against Suarez was enhanced because it reflected this increased quantity of marijuana. The Seventh Circuit affirmed the district court's upward adjustment.

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

To prevail in a proceeding to revoke naturalization, the government must prove its case by clear, convincing, and unequivocal evidence, and leave no issue in doubt. *Fedorenko v. United States*, 449 U.S. 490, 507 (1981); *United States v. Ekpin,* 214 F.Supp.2d 707, 712 (S.D. Tex. 2002). This is a heavy burden, but if the government carries it a district court "lacks discretion" and "is compelled to enter a judgment of denaturalization." *United States v. Jean-Baptiste,* 395 F.3d 1190, 1192 (11th Cir. 2005) (Cudahy, J., sitting by designation); see also *Fedorenko*, 449 U.S. at 517; *United States v. Ciurinskas*, 148 F.3d 729, 732 (7th Cir. 1998) (a court lacks "discretion to refuse to revoke citizenship" where an individual procured it unlawfully). Furthermore, despite the government's heavy burden of proof in a denaturalization

case, summary judgment is appropriate when no genuine triable issue of fact exists. See *United States v. Koreh*, 59 F.3d 431, 446 (3rd Cir. 1995).

**III.    Analysis**

The U.S. Supreme Court has described United States citizenship "as the highest hope of civilized men" and has concluded that "once [United States] citizenship has been conferred, it should not be taken away without the clearest sort of justification and proof." *Schneiderman v. U.S.*, 320 U.S. 118 (1943). However, § 340(a) of the INA, 8 U.S.C. § 1451(a), provides that the order admitting a naturalized citizen to citizenship may be revoked and set aside and that the certificate of naturalization may be cancelled if the order and certificate were "illegally procured or were procured by concealment of a material fact or by willful misrepresentation." Here, the government moved for summary judgment only as to Count I of its complaint, and the Court only considers the government's contention that Suarez's citizenship was illegally procured.

Citizenship is "illegally procured" within the meaning of § 1451(a) when it is procured by a person who was statutorily ineligible for naturalization. *Fedorenko v. United States,* 449 U.S. 490, 507. To be statutorily eligible for naturalization, an individual must demonstrate that, during the time period prescribed by the statute, he "has been and still is a person of good moral character." 8 U.S.C. § 1427(a)(3). Ordinarily the statutory period during which good moral character is required begins five years before the date on which the person's application for naturalization is filed with the INS and ends on the date that the person takes the oath of allegiance and is naturalized as a United States citizen.[3] *Id.* In the instant case, Mr. Suarez filed his application on December 17, 1996, and he took the oath of allegiance on May 14, 1998;

---

[3]   The five-year requirement is shortened to three years for persons who are married to United States citizens. See 8 U.S.C. 1430(a).

therefore, the statutory period for which Mr. Suarez was required to be a person of good moral character began on December 17, 1991, and continued until May 14, 1998.

According to the government, Mr. Suarez's commission of drug related crimes in 1996, prior to his naturalization, precluded him from meeting the statutory requirement of good moral character. In a prior criminal proceeding in the United States District Court for the Northern District of Illinois, a jury convicted Mr. Suarez of the crimes of Conspiracy to Possess with Intent to Distribute Marijuana in violation of 21 U.S.C. § 846 and Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1). Mr. Suarez characterizes his involvement in the drug conspiracy as minimal.[4] The government submits that regardless of Suarez's characterization of his involvement in the drug conspiracy, collateral estoppel precludes the re-litigation of issues decided in his criminal case. See *Nathan v. Tenna Corp.*, 560 F.2d 761, 763-764 (7th Cir. 1977) (finding that federal criminal conviction can operate to determine issues in later civil litigation where the doctrine of collateral estoppel applies).

In order for the application of collateral estoppel to occur, four requirements must be satisfied: (1) the issue to be precluded must be identical to the one involved in the prior action, (2) the issue in the prior action must have been litigated, (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that action, and (4) the party against whom the earlier decision is asserted was "fully represented" in earlier litigation. *Universal Guaranty Life Insurance Co. v. Coughlin*, 481 F.3d 458, 462 (7th Cir. 2007); *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). Here, all four elements necessary for the application of collateral estoppel are present. First, the criminal conduct committed by Suarez between June and October 1996 is the exact issue that Plaintiff seeks to preclude from being re-

---

[4] During his deposition on April 1, 2009, Mr. Suarez testified that his "involvement [in the drug conspiracy] was very, I mean it was really, you know, it was – I mean it was nothing really."

6

litigated in this action. The record of conviction shows that between June and October 22, 1996, Mr. Suarez conspired with others to distribute a large quantity of marijuana, and that he possessed marijuana with the intent that it be distributed. Second, the issue to be precluded was already litigated. Mr. Suarez was tried in U.S. District Court in the Northern District of Illinois on the charges of Conspiracy to Possess with Intent to Distribute Marijuana and Possession with Intent to Distribute Marijuana and a jury found him guilty beyond a reasonable doubt on both counts. Third, in order for the jury to have rendered its guilty verdict, Mr. Suarez's commission of conspiracy to possess marijuana and possession with intent to distribute marijuana must have been proven beyond a reasonable doubt. And finally, Suarez was "fully represented" in the earlier litigation. An attorney represented Suarez during his criminal trial before the district court, and Suarez, through his counsel, timely appealed his conviction to the Seventh Circuit Court of Appeals, which upheld the conviction. See, *e.g.*, *Jean-Baptiste*, 395 F.3d at 1194 (determining that collateral estoppel prevented defendant from re-litigating the issue of whether he committed the specific acts underlying his federal conviction on drug charges in a civil de-naturalization action under 8 U.S.C. § 1451(a)). Based on the foregoing, Suarez is collaterally estopped from denying his participation in the conspiracy to distribute marijuana during the period of time in which he was required to establish his good moral character in order to qualify for naturalization.

Because Suarez committed his unlawful acts while his naturalization application was pending, but was convicted of those offenses after he became a naturalized citizen, the specific question here, as in *Jean-Baptiste*, is whether the *commission*, in contrast to the *conviction*, of a crime negates good character during the critical statutory period.[5] While the Immigration and

---

[5] In *Jean-Baptiste*, the Eleventh Circuit (in an opinion penned by Seventh Circuit Judge Richard Cudahy, sitting by designation) addressed the precise question involved in this case: "whether a

7

Naturalization Act ("INA") does not specifically define what "good moral character" is, it quite clearly states what it is not. Among the entries in a non-exhaustive list of categories of persons who cannot establish good moral character for purposes of the statute are individuals convicted of trafficking in controlled substances and those convicted of other crimes. 8 U.S.C. § 1101(f)(3), (8). While this section is not directly on point to the present facts because it speaks to *conviction* and not to *commission* of a crime, it does illustrate what types of unlawful behavior may bar an applicant from establishing good moral character in that context, particularly in view of the expansive "catch-all" provision in the last section of 8 U.S.C. § 1101(f). The final section of 8 U.S.C. § 1101(f) contains a "catch-all" provision which cautions that "the fact that any person is not within any of the foregoing classes shall not preclude a finding that for such reasons such person is or was not of good moral character."

Numerous other statutory and regulatory provisions also suggest the contours of a definition of good moral character. Under 8 U.S.C. § 1182(a)(2), which is referenced in 8 U.S.C. § 1101(f)(3), aliens who are inadmissible to citizenship on criminal and related grounds include those who commit or conspire to commit a crime of moral turpitude as well as aliens who assist others in trafficking in controlled substances. In addition, 8 C.F.R. § 316.10, a regulation based on 8 U.S.C. § 1101(f), sets forth additional categories of persons who cannot establish good moral character, including applicants convicted of an aggravated felony, a crime of moral turpitude, or a controlled substance violation. The "catch-all" provision of 8 C.F.R § 316.10(b) states that applicants who have *committed* acts adversely reflecting on moral character during the statutory period cannot establish the requisite good moral character. Suarez does not deny that

---

naturalized citizen who committed certain unlawful acts during the statutory period *prior* to taking the oath of allegiance but for which he was indicted, arrested and convicted *after* naturalization stands to lose his precious acquisition for lack of good moral character." 395 F.3d at 1191 (emphasis in original). The *Jean-Baptiste* court concluded, "Unfortunately, the answer is yes." *Id*.

he was required to maintain good moral character from the date of application until he took the oath of allegiance; instead, he claims that he does not fit within any of the enumerated statutory categories for establishing a lack of good moral character and thus he did possess good moral character throughout this period.

Suarez was convicted of knowingly and intentionally conspiring to possess marijuana with intent to distribute. This offense is an aggravated felony, a crime of moral turpitude, and a controlled substances violation – all categories of offenses the commission of which bar a naturalization applicant from establishing the requisite good moral character.[6] Suarez's failure to establish good moral character was not as an alien who was *convicted* of or who *admitted* trafficking in controlled substances under 8 U.S.C. § 1101(f)(3) or as an alien *convicted* of an aggravated felony under 8 U.S.C. § 1101(f)(8), before the taking of the oath of allegiance. Indeed, at or before the time of his naturalization Suarez had not been indicted for, much less convicted of, a drug offense, nor is there evidence to suggest that he had admitted such an act at

---

[6] Mr. Suarez's 1999 convictions in violation of 21 U.S.C. §§ 841(a)(1) and 846 are federal felonies that are punishable under the Controlled Substances Act, and therefore fall within the definition of "drug trafficking crime" set forth at 18 U.S.C. § 924( c). See § 924( c) (defining "drug trafficking crime" as "any felony punishable under the Controlled Substances Act (21 U.S.C. § 801 et seq.) * * *."); see also *Navarro-Macias v. I.N.S.*, 16 Fed. Appx. 468, 472 (7th Cir. 2001) (noting that in 1988, Congress broadened the definition of drug trafficking crime under § 924(c)(2) to encompass "any felony punishable under the Controlled Substances Act."). The definition of aggravated felony includes "illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924( c) of Title 18)." Thus, both of Mr. Suarez's crimes qualify as aggravated felonies under the plain language of § 101(a)(43) of the INA, 8 U.S.C. § 1101(a)(43). See *U.S. v. Nash*, 876 F.2d 1359 (7th Cir. 1989) (conviction under 21 U.S.C. § 841(a)(1) for possessing marijuana with intent to distribute is a crime which involves the distribution of a controlled substance); see also *Navarro-Macias v. I.N.S.*, 16 Fed. Appx. 468, 472 (7th Cir. 2001). In addition, federal courts have found drug trafficking offenses to be crimes of moral turpitude, which thereby negate a person's good moral character. See, *e.g.*, *Padilla v. Kentucky*, 130 S.Ct. 1473, 1479-80 (U.S. 2010) (noting that "[e]xcept for 'technical, inadvertent and significant violations of the laws relating to narcotics,' it appears that courts treat narcotics offenses as crimes involving moral turpitude for purposes of the 1917 Act's broad [judicial recommendation against deportation] provision."); *Barragan-Lopez v. Mukasey*, 508 F.3d 899 (9th Cir. 2007) (solicitation to possess at least four pounds of marijuana is a crime which involves moral turpitude under the immigration laws).

that time. Instead, the Court looks to the final "catch-all" section of 8 U.S.C. § 1101(f)(8), in which Congress delegated authority to the former INS to set forth "other reasons" affecting determinations of good moral character. Pursuant to this authority, Congress delegated to the Attorney General authority to issue 8 C.F.R. § 316.10, including § 316.10(b)(3)(iii), which states that "the applicant shall be found to lack good moral character if, during the statutory period, the applicant * * * (iii) [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b)(1) or (2)." This regulation is entitled to deference. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44 (1984) ("if Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.") Furthermore, this determination is supported by case law. See, *e.g., Jean-Baptiste,* 395 F.3d at 1194; *United States v. Kiang,* 56 Fed. Appx. 696 (6th Cir. 2003) (unpublished) ("8 C.F.R. § 316.10(c)(1) represents a reasonable interpretation of the statutory requirement of good moral character and is not ultra vires"), *DeLuca v. Ashcroft,* 203 F.Supp.2d 1276, 1279 (M.D. Ala. 2002) ( 8 C.F.R. § 316.10 is a fair interpretation of Congress's intentions); *Jimenez v. Eddy,* 153 F. Supp. 2d 1105, 1107 (2001) (stating that 8 C.F.R. § 316.10(c)(1) is not an arbitrary or capricious interpretation of 8 C.F.R. § 316(a) and § 1101(f)). Accordingly, because Suarez committed a drug offense as established by his later conviction, he was precluded under 8 U.S.C. § 1101(f)(8), as elaborated in 8 C.F.R. § 316.10(b)(3)(iii), from establishing good moral character, and thus was barred from acquiring citizenship.

Federal courts consistently have held that commission of criminal acts prior to naturalization and during the statutory period for good moral character precludes an individual

from meeting the good moral character requirement and qualifying for naturalization as a matter of law. In addition to *Jean-Baptiste*, the Ninth Circuit in *U.S. v. Dang*, 488 F.3d 1135 (9th Cir. 2007), held that defendant's commission of arson and willful injury to child, prior to her naturalization, were unlawful acts that, pursuant to 8 U.S.C. § 1101(f) and 8 C.F.R. § 316.10(b)(3)(iii), precluded her from meeting the required good moral character for naturalization. Likewise, in *U.S. v. Lekarczyk*, 354 F. Supp. 2d 883, 887-888 (W.D. Wis. 2005), the court held that the defendant's commission of bank fraud, forgery-uttering, and bail jumping prior to his naturalization and during the statutory period for good moral character disqualified him from eligibility for naturalization, reasoning that the defendant could not have established good moral character under 8 C.F.R. § 316.10(b)(3)(iii) because of his commission of unlawful acts. See also *U.S. v. Mwalumba*, 688 F. Supp. 2d 565, 568 (N.D. Tex. 2010) (finding it "difficult to imagine" how defendant could argue "that the crimes he committed somehow reflect less adversely on his moral character simply because at the time he became a naturalized citizen, he had committed – but had not yet been convicted of – these crimes"); *U.S. v. Okeke*, 671 F. Supp. 2d 744, 750 (D. Md. 2009) (finding that defendant lacked good moral character during the statutory period for obtaining naturalization and thus illegally procured his naturalization); *Meyersiek v. USCIS*, 445 F. Supp. 2d 202, 207 (D.R.I. 2006) (upholding denial of a naturalization application under the "unlawful acts" regulation (8 C.F.R. § 316.10(b)(3)(iii)) because the applicant made a fraudulent medical claim); *U.S. v. Ekpin*, 214 F. Supp. 2d 707, 715-17 (S.D. Tex. 2002) (defendant illegally procured his naturalization because he committed sexual abuse crimes against his daughter before naturalizing).

Suarez's criminal acts are unlawful acts falling squarely within the statutory period in which he was required to establish his good moral character. Furthermore, commission of

conspiracy to possess marijuana with intent to distribute and possession of marijuana with intent to distribute are serious violations of law which undermined Suarez's ability to establish good moral character. Absent extenuating circumstances, Suarez's unlawful conduct foreclosed him from establishing good moral character, even prior to being arrested, indicted, and convicted on federal drug charges.

Suarez attempts to convince the Court that extenuating circumstances explain his conduct. Suarez argues that: (1) payment of his debt to society for his crimes, (2) his claimed minimal involvement in a serious drug trafficking crime, and (3) the fact that he had no prior convictions are extenuating circumstances which have raised a genuine issue of material fact that precludes the entry of summary judgment. Courts analyzing the meaning of extenuating circumstances under 8 C.F.R. § 316.10(b)(3)(iii) have found that they "must pertain to the reasons showing lack of good moral character, including acts negating good character, not to the consequences of these matters, including the consequence of denaturalization." *U.S. v. Jean-Baptiste*, 395 F.3d 1190, 1195 (11th Cir. 2005) (citing *Rico v. INS*, 262 F. Supp. 2d 6 (E.D.N.Y. 2003)). None of the circumstances raised by Suarez mitigate his lack of good moral character. Mr. Suarez's post-naturalization assertion that he has now paid his debt to society for his crime by completing his prison sentence and conditions of his parole has no bearing on whether he had established good moral character when he applied for naturalization. Mr. Suarez's completion of his criminal sentence is a consequence of his conviction. *Id.* Moreover, Mr. Suarez's perception of his crimes as trivial does not mean they are not unlawful acts.[7] See also *U. S. v. Lekarczyk*,

---

[7] Suarez's contention that his roles in the crimes were minimal is unsupported by the record. Instead, the record of conviction evidences his commission of two serious crimes involving drug trafficking. The 87-month prison sentence and subsequent parole he received are indicative of the seriousness of his culpability for his offense. Moreover, had Suarez's conviction occurred before his naturalization, he would have been barred permanently from showing good moral character and qualifying for naturalization. See 8 U.S.C. §§ 1101(f)(8), 1101(a)(43)(B); 8 C.F.R. § 316.10(b)(ii). Suarez argues that

354 F.Supp.2d 883, 887 (W.D. Wis. 2005) ("mere fact that bank fraud, forgery-uttering, and bail jumping are crimes makes commission of those acts illegal" and they are therefore "unlawful acts" within the meaning of 8 C.F.R. § 316.10(b)(3)(iii)); *Meyersiek v. USCIS*, 445 F.Supp. 2d 202, 205 (D.R.I. 2006) (defining "unlawful acts" as "bad acts that would rise to the level of criminality, regardless of whether a criminal prosecution was actually issued.").

The result urged by Suarez turns the statutory requirement of good moral character on its head as it permits the naturalization of a person who commits serious criminal acts prior to naturalization, but manages not to get caught until after he or she gets sworn in as a United States citizen. In other words, it accords United States citizenship to a person who does not qualify under the law. Mr. Suarez's interpretation of the law directly contravenes established Supreme Court precedent, which says that where a person fails to meet any of the congressionally mandated requirements for naturalization, his or her naturalization has been illegally procured and is subject to revocation. *Fedorenko v. United States*, 449 U.S. 490, 493 (1981); *Kungys v. United States*, 485 U.S. 759 (1988).

## IV. Conclusion

Certainly, the right to acquire United States citizenship is precious and coveted. Accordingly, when the government seeks to strip citizenship from one who has acquired it,

---

the government has failed to establish its burden of proof because it cannot rely on the contents of the pre-sentence investigation report and sentencing hearing to show that there were no extenuating circumstances. However, none of the findings made in the pre-sentence investigation report and sentencing hearing are necessary to show that Suarez illegally procured his naturalization. The record of conviction suffices to establish that between June 1996 and October 1996, during the period of time he was required to show good moral character, Suarez knowingly possessed 196 pounds of marijuana with the intent to distribute and knowingly conspired with others. The knowing possession of 196 pounds of unlawful drugs for the purpose of distribution was a material fact of the indictment against Mr. Suarez, on the basis of which a jury entered a verdict of guilty. Of similar relevance was the fact that Mr. Suarez participated in "various meetings and conversations" about the "pick-up and transportation of the Marijuana Shipment."

denaturalization proceedings can have "severe and unsettling consequences." See *Fedorenko*, 449 U.S. at 505. Nonetheless, upon determining that a naturalized citizen illegally procured citizenship, the Court lacks discretion to withhold an order of denaturalization, with all its negative consequences for the denaturalized person and his family. Because Suarez, through his commission of two serious crimes, lacked the good moral character requisite for naturalization, the Court finds under 8 C.F.R. § 316.10(b)(3)(iii) that his citizenship was illegally procured. See also *Jean-Baptiste*, 395 F.3d at 1196.

For these reasons, the Court grants Plaintiff's motion for summary judgment [40]. The May 14, 1998 naturalization of Jose Suarez, ordered by the Attorney General of the United States and admitting Defendant Suarez to citizenship of the United States is revoked and set aside, and Certificate of Naturalization 2233325, issued by the Attorney General of the United States to Jose Suarez, is cancelled. From the date of this order, Defendant forever is restrained and enjoined from claiming any rights, privileges, or advantages of United States citizenship based upon his May 14, 1998 naturalization. Defendant Suarez shall surrender and deliver his Certificate of Naturalization, any copies thereof in his possession, and any other indicia of United States citizenship to the Secretary of the Department of Homeland Security or her representative.

Dated: August 27, 2010 _____
Robert M. Dow, Jr.
United States District Judge